IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JUDY M. FINN,                    )
                                 )
            Plaintiff,           )           4:06CV3269
                                 )
        v.                       )
                                 )
NORTHWESTERN MUTUAL LIFE         )        MEMORANDUM AND ORDER
INSURANCE COMPANY,               )
                                 )
            Defendant.           )
_____ )

INTRODUCTION

     Pursuant to the parties' consent, this case is pending
before me for final disposition.[1]  The plaintiff's pro se
complaint alleges the defendant Northwestern Mutual Life
Insurance Company, ("NML"), arbitrarily and capriciously denied
her claim for disability benefits.  The plaintiff alleges she is
entitled to benefits under a group long-term disability policy
issued by NML and provided to the plaintiff through her employer,
Pathology Medical Services, P.C. ("PMS").  See filing 1.

     The defendant's answer alleges the plaintiff's claim was
denied because, applying the terms and definitions of the policy,
the plaintiff was not disabled while insured.  NML further
alleges that plaintiff's claim is governed by the Employee
Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001
et seq, and to the extent she seeks remedies not provided for
under ERISA, those remedies and claims are preempted by ERISA.
Filing 9, p. 2.  The defendant alleges the plaintiff failed to
perform all conditions precedent to recovery under the policy,

_____

     [1]See filing 10, "Consent to Exercise of Jurisdiction by a
United States Magistrate Judge," and 28 U.S.C. § 636(c)(2).

and failed to file her claim within the applicable limitations
period.  Filing 9, p. 3.

The court has held that this case is governed by ERISA.
Filing 20.  The defendant has filed the administrative record,
(filing 39),[2] and a motion for summary judgment.  Filing 30.  The
parties have filed briefs in support of their respective
positions.  See filings 25, 32, and 40.  The defendant's motion
for summary judgment is fully submitted.

STANDARD OF REVIEW

Motions for summary judgment are an "integral part of the
Federal Rules of Civil Procedure and designed to secure the just,
speedy and inexpensive determination of every action."  Celotex
Corp. v. Catrett, 477 U.S. 317, 327 (1986).  "One of the
principal purposes of summary judgment procedure is to isolate
and dispose of factually unsupported claims or defenses."
Celotex, 477 U.S. at 323-24.  Under Rule 56(c) of the Federal
Rules of Civil Procedure, "[s]ummary judgment is appropriate when
the evidence, viewed in a light most favorable to the non-moving
party, demonstrates that there is no genuine issue of material

---

[2]The court notes that all the individual documents within
the administrative record were Bates-stamped in reverse
sequential order; for example, the five-page ruling on
plaintiff's social security claim begins on Bates-number page
00405 and ends on page 00401.  Documents filed in this manner,
particularly complicated and extensive medical records, insurance
policies, and policy amendments, are difficult to organize and
read.  The defendant's numbering method added confusion to the
task of deciphering the chronological sequence of events, an
important and perhaps controlling factor in this case.  Counsel
for the defendant is advised to more carefully supervise and
review the numbering of records submitted with future filings in
this court.

2

fact, and that the moving party is entitled to judgment as a matter of law." <u>Carrington v. City of Des Moines, Iowa</u>, 481 F.3d 1046, 1050 (8th Cir. 2007).

As set forth in the parties' briefs, the issues raised in this case include:  1) whether NML's denial of benefits is subject to an "arbitrary and capricious" standard of review or a sliding scale analysis, (filing 25, p. 4; filing 32, p. 11); 2) whether NML improperly denied the plaintiff's disability claim, (filing 25, p. 4; filing 32, p. 15); and 3) whether the plaintiff's lawsuit is barred by the statute of limitations, (filing 25, p. 4; filing 32, p. 25; filing 40).

The defendant has filed the administrative record under seal in support of its motion for summary judgment.[3]  The material facts are undisputed.  Therefore, the resolution of the motion rests on the application of these undisputed facts to the legal principles governing cases arising under ERISA.  For the reasons discussed below, the court need not and does not determine whether the plaintiff's claim is barred by the statute of limitations.  Rather, the court concludes that irrespective of whether this suit was timely filed, NML's determination that

---

[3]The plaintiff objects to the record being filed under seal, stating the public should be allowed to see how NML has handled her claim.  Pursuant to this court's local rules, (NeCivR 5.3(a)), the administrative record was appropriately filed under seal, and it will remain under seal.  The record includes numerous references to personal identifying information which cannot be filed of public record pursuant to the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (codified at 5 U.S.C. §§ 3701-3707 and scattered sections).  This statute and the court's accompanying local rules were adopted to protect the plaintiff from identity theft and criminal misuse of her personal information.

3

benefits should be denied was not arbitrary or capricious, and
the defendant is entitled to judgment as a matter of law.

FINDINGS OF FACT

The plaintiff was employed by PMS in the 1970s and remained
employed by PMS until she resigned effective January 31, 2003.
Filing 1, p. 2; filing 39, Bates-stamped p. 00568.  The plaintiff
had long term disability (LTD) insurance coverage through a group
policy (LTD Policy L653691) available through her PMS employment
and issued by NML.  Filing 1, p. 2; filing 39, Bates-stamped pp.
00020, 00024.  She was 54-years-old at the time of her
resignation.

Prior to January 31, 2003, the plaintiff had a longstanding
history of significant medical problems dating back to at least
1980, including cervical and lumbar disc problems,
hyperthyroidism, breast cancer, and coronary artery disease.
Filing 39, Bates-stamped pp. 00126, 00133-34.  The plaintiff's
cardiac problems date back to 1998, and she had coronary artery
bypass surgery in 1999.  Filing 39, Bates-stamped pp. 00134, 536.
The plaintiff was treated for angina, hypertension, and
hypercholesterolemia in 2001.  Filing 39, Bates-stamped p. 00536.

The plaintiff was seen at the Nebraska Heart Institute on
January 6, 2003 for treatment of chest pain and jaw pain
associated with activity.  She reportedly had symptoms of fatigue
over the previous nine months.  Filing 39, Bates-stamped p.
00503.  The doctor performed a heart catheterization the
following day.  Filing 39, Bates-stamped p. 00501.  Based on the
results of this procedure, the cardiologist scheduled a
Cardiolite scan for January 27, 2003, and coronary artery bypass

4

surgery for January 31, 2003.  Filing 39, Bates-stamped pp.
00505, 510-13, 534.

On January 26, 2003, the plaintiff completed and signed a
Group Disability Claim Employee Statement stating that she was
quitting her employment for health reasons on January 31, 2003,
and effective that day, she would no longer be able to work.  She
noted on the form that she was scheduled for her second open
heart surgery on January 31, 2003.  This disability claim
statement was not immediately sent to NML, and was not received
by NML until May 15, 2003.  Filing 39, Bates-stamped pp. 00107-
08.  The administrative record contains no medical records
indicating that prior to the plaintiff's surgery, her
cardiologist or other medical providers anticipated or told her
that she would be unable to return to work after recuperating
from her bypass surgery.

The surgery was performed as scheduled on January 31, 2003.
Filing 39, Bates-stamped p. 00508.

Based on the administrative record, following her release
from the hospital, the plaintiff did not see a doctor again until
March 7, 2003.  On that date, she was examined and "evaluated for
disability" by her internal medicine doctor, Jason Potts, M.D.
Filing 39, Bates-stamped p. 00382.  The plaintiff told Dr. Potts
that she did well during and following the surgery, but had
developed incidents of recurrent angina and shortness of breath
over the past few weeks during activity.  All but one of these
incidents subsided with rest alone, and the remaining incident
resolved completely with a Nitroglycerin pill.  The plaintiff was
otherwise "doing well," but she was "concerned about finances and

is being evaluated for disability currently."  Filing 39,
Bates-stamped p. 00382.

     Dr. Potts completed a Group Disability Claim Attending
Physician Statement on March 11, 2003, which explained that the
plaintiff had undergone bypass surgery on January 31, 2003, and
was not to return to work for 8 weeks thereafter while she was
performing cardiac rehabilitation.  See filing 39, Bates-stamped
pp. 00105-06.  As of the date of this report, the plaintiff had
not started her cardiac rehabilitation.  See filing 39,
Bates-stamped p. 00382.  According to Dr. Potts' statement, as of
March 7, 2003, the plaintiff had marked cardiac impairment, a
mild impairment in performing the activities of daily living, and
could not drive or lift more than 20 pounds, but she could sit 8
hours a day, and had no impairment in social functioning,
concentration, cognition, or adaptation to stress.  Filing 39,
Bates-stamped pp. 00105-106.  The statement further explained
that the plaintiff's condition had improved, and she had been
doing well, but had a recent setback and recurrence of her chest
pains.  Dr. Potts noted it was unclear when the plaintiff could
return to work, and she was to see the doctor again in 2 to 3
weeks.  Filing 39, Bates-stamped p. 00105.  The plaintiff did not
do so.

     The plaintiff submitted her disability claim to NML on May
15, 2003.  Filing 39, Bates-stamped p. 00108.  Pursuant to the
terms of the LTD policy, NML was afforded broad authority to
review and determine whether benefits were owed on this claim.
Under the policy section entitled "SECTION 8: ALLOCATION OF
AUTHORITY," the policy stated:

          Except for those functions which the Policy
          specifically reserves to the Policyowner, the Company

6

> [NML] has full and exclusive authority to control and
> manage the Policy, to administer claims, and to
> interpret the Policy and resolve all questions arising
> in the administration, interpretation, and application
> of the Policy.
>
> The Company's authority includes, but is not limited
> to:
> *    The right to resolve all matters when a review has
>      been requested;
> *    The right to establish and enforce rules and
>      procedures for the administration of the Policy
>      and any claim under it;
> *    The right to determine:
>      (1)  Your eligibility for insurance;
>      (2)  Your entitlement to benefits;
>      (3)  The amount of benefits payable to you;
>      (4)  The sufficiency and the amount of information
>           the Company may reasonably require to
>           determine 1, 2, or 3 above.
>
> Subject to the review procedures of the Policy, any
> decision the Company makes in the exercise of the
> Company's authority is conclusive and binding.

Filing 39, Bates-stamped p. 00004.

As to the time frame starting after Dr. Potts completed the
March 11, 2003 physician statement and ending before May 15,
2003, there are no medical records explaining the plaintiff's
condition, degree of recovery and recuperation, physical or
mental limitations, or ability to return to work.  According to
Dr. Potts' medical record, the plaintiff was reportedly scheduled
to see her cardiologist, Dr. Kamram Ghalili, the week following
March 7, 2003.  Filing 39, Bates-stamped p. 00382.  The plaintiff
did not attend this appointment.  See filing 39, Bates-stamped p.
00536.

To facilitate NML's assessment of the plaintiff's claim, PMS
completed a Group Disability Claim Employer Statement on June 12,
2003.  PMS reported that the plaintiff's was a "Systems Manager"

7

at the time of her resignation.  According to the Employer
Statement, the plaintiff worked 40 hours per week at this job,
and the job required her to lift and carry no more than 10 pounds
in a work day; sit for 6 hours a day, 1-2 hours at a time; stand
for a 1 hour a day, 15 minutes at a time; walk for 1 hour a day,
15 minutes at a time; and occasionally bend, stoop, twist, squat,
kneel, lift, and carry.  Filing 39, Bates-stamped p. 00113.
Based on this information, NML concluded the plaintiff's PMS job
was a sedentary occupation.  Filing 39, Bates-stamped p. 00115.

As applied to PMS employees such as the plaintiff, the NML
LTD policy in effect in 2003 provided that the plaintiff was
entitled to disability payments if she became "Disabled while
insured under the Policy," was "under the ongoing care of a
Physician Or Practitioner," was disabled due to "an Injury,
Sickness, or Pregnancy," filed a timely "Proof of Loss," and
disability coverage was not excluded under the "Exclusions and
Limitations" section of the policy.  Filing 39, Bates-stamped p.
00015.

Since the plaintiff did not return to work on even a part-
time basis following her bypass surgery, to assess the
plaintiff's claim for benefits, NML was required to determine if
she was disabled under either the Own Occupation or Any
Occupation provisions of the policy.  Filing 39, Bates-stamped p.
00013.  The plaintiff was entitled to Own Occupation benefits if,
while insured, she became unable to perform with reasonable
continuity the material duties of her own occupation due to
sickness, injury, or pregnancy.  Own Occupation disability
coverage was defined to begin the 91st day after the onset of
disability and to extend for 24 months thereafter.  Filing 39,
Bates-stamped pp. 00013, 00025-27.  Once the Own Occupation

8

disability period ended, the plaintiff was entitled to Any
Occupation disability benefits until the age of 65 if she was
"unable to perform with reasonable continuity the material duties
of any gainful occupation for which [she was] reasonably fitted
by education, training, and experience."  Filing 39,
Bates-stamped pp. 00019, 00025.

The parties do not dispute that the plaintiff filed a timely
proof of loss and had a medically diagnosed heart condition at
the time of her resignation, and there is no claim that any of
the policy's "Exclusions and Limitations" apply to the
plaintiff's circumstances.  However, NML concluded the plaintiff
was not "Disabled" while insured under the policy and denied the
plaintiff's disability claim on June 27, 2003.  NML's letter
explained:

> According to the group policy, in order to qualify for
> LTD benefits, you are required to meet the definition
> of disability.  Information submitted by your
> physician, Jason Potts, M.D., indicates that you had
> surgery, hospitalization and cardiac rehabilitation
> commencing on January 31, 2003 and you were not to
> return to work for eight weeks following surgery.
> Given that eight weeks recovery for coronary bypass
> surgery is reasonable, we do not find that you have had
> continuing limitations that would prevent you from
> performing the material duties of a sedentary
> occupation for more than 91 days.  Your claim must
> therefore be denied as you did not fulfill the 90 day
> waiting period or the definition of disability as
> defined in your group policy.

Filing 39, Bates-stamped p. 00115.  The letter advised the
plaintiff that she could request a review of the decision, and
could submit additional information in support of this review,
within 180 days.  Filing 39, Bates-stamped p. 00115.

The plaintiff sent a letter to NML on September 22, 2003
stating that she intended to request a review of her claim and
would be sending additional information within a few weeks.
Filing 39, Bates-stamped p. 00117.

The plaintiff attended her first follow up appointment with
her cardiologist, Dr. Ghalili, on October 29, 2003, six months
after her bypass surgery.  Filing 39, Bates-stamped p. 00515
(Ghalili's October 29, 2003 report noting "[t]his was the first
follow up since her surgery six months ago.")  Dr. Ghalili's
medical record from that appointment noted that the plaintiff had
been prescribed Toprol upon discharge from the hospital following
her heart surgery, but she never renewed this prescription.  The
plaintiff had no complaints when she saw Dr. Ghalili on October
29, 2003.  Specifically, she denied having any chest pain,
tightness, or heaviness; shortness of breath, orthopnea,[4] or
PND;[5] ankle swelling; or skipped or rapid heart beats.  Although
her heart rate was elevated, she reportedly related this "to
stress perhaps regarding seeking some potential disability."
Filing 39, Bates-stamped p. 00515.  The plaintiff was advised to
have her heart rate and blood pressure monitored by her primary
physician, and was to return for further evaluation by Dr.
Ghalili in six months.  She did not return until October 1, 2004.
Filing 39, Bates-stamped p. 00537.

Based on the plaintiff's evaluation on October 29, 2003, Dr.
Ghalili sent the following letter to NML on November 3, 2003:

---

[4]Orthopnea is the inability to breathe easily unless one is
sitting up straight or standing erect.

[5]Paroxysmal nocturnal dyspnea (PND) is shortness of breath
or breathing difficulty while lying down.

10

> Judy Finn is a patient of mine.  She has had prior
> bypass surgery and then redo bypass surgery in the
> past.  She does not tolerate stressful situations very
> well.  Her heart rate goes up to around 90 to 100 under
> any stress.  Apparently, she has had stress at her work
> at [P]MS.
>
> My recommendation is for her to stay away from
> stressful situations as much as she can, otherwise
> continue with the cardiac medication.  She can work at
> other types of jobs.  Meanwhile, if there are any
> questions please feel free to contact me.

Filing 39, Bates-stamped p. 00121.

After receiving this letter, NML again denied the
plaintiff's claim on November 13, 2003.  NML's denial letter
noted that pursuant to the plaintiff's letter dated September 22,
2003, it was unclear whether the plaintiff still intended to send
additional information to the company.  Nonetheless, NML
explained that based on Dr. Ghalili's November 3, 2003 letter,
which NML received on November 10, 2003:

> [I]t appears that Dr. Ghalili is indicating that you
> are capable of working, but that you have stress
> related issues with regard to your employment with your
> former employer.  As stated above, as well as defined
> in your group policy, we do not insure you if you are
> unable to work for a particular employer; rather, we
> insure you if you are unable to perform the material
> duties of your occupation, that of a Systems Manager,
> for any employer.  Based on our review of Dr. Ghalili's
> letter, it does not appear that you are limited from
> performing the duties of your occupation for any
> employer.

Filing 39, Bates-stamped pp. 00118-19.  The plaintiff was advised
that she could seek additional review of the claim denial by
NML's Quality Assurance Unit by submitting a written request, and
she could also seek review by the State of Nebraska Department of
Insurance.  Filing 39, Bates-stamped p. 00118.

The plaintiff sent a letter to NML on January 24, 2004 stating NML's denial of her claim, and the facts it relied on in reaching this conclusion, were incorrect.  She noted that she not only had heart problems, but also had a history of breast cancer and thyroid problems.  She further specifically recounted that the occupation of Systems Manger was very stressful, especially in the industry she worked for, and that PMS' description of her job was inaccurate.   The plaintiff explained:

> The job description submitted by my employer was inaccurate.  An employee, who had no idea what my job involved, completed it.  A more accurate job description including the long hours and high level of responsibility should be used in processing this claim.

Filing 39, Bates-stamped p. 00123.  The plaintiff's letter continued, "if you get a realistic description of my job, communicate with other people doing the same work, and get an accurate and complete description of my medical condition, you would agree that I am entitled to disability benefits under this policy."  Filing 39, Bates-stamped p. 00122.  The plaintiff advised NML that she would contact the company in two months regarding her decision on how to proceed.  Filing 39, Bates-stamped p. 00122.

NML responded on January 29, 2004, reminding the plaintiff that any additional review request must be submitted in writing, that any additional medical records for NML's consideration should be submitted with that request, and that "it would be helpful if you would provide a written detailed job description of the duties of your occupation, that of a systems manager, as you see them."  Filing 39, Bates-stamped p. 00131.

12

The plaintiff's husband contacted NML regarding this claim on July 12, 2004, and asked if he and the plaintiff could still submit additional information for further review of the plaintiff's claim.  NML affirmed that it would further review the plaintiff's claim and any additional information submitted upon plaintiff's written request.  Filing 39, Bates-stamped p. 00130.

The plaintiff's heart problems apparently increased beginning in August of 2004.  She transferred her internal medicine care to Dr. Shawn Semin, Dr. Potts' partner, on September 17, 2004, and saw Dr. Semin on that date.  She complained of angina symptoms, jaw ache, and left arm discomfort.  She was emotional and depressed, and stated her two parents were in poor health and she was spending most of her time caring for them and transporting them to and from their appointments.  Based on the plaintiff's cardiac complaints, she was scheduled to see Dr. Ghalili on October 1, 2004.  Filing 39, Bates-stamped pp. 00383-84.

When the plaintiff saw Dr. Ghalili, she reported that her increased cardiac symptoms had started a month and a half earlier, and during recent weeks, she had daily chest discomfort that resolved only with Nitroglycerin.  A repeat cardiac catheterization was scheduled.  Filing 39, Bates-stamped pp. 00516-18.  Based on that testing, another cardiac stent was inserted on October 18, 2004.  By a week later, her jaw pain was gone, her energy was improving, and she was feeling "pretty well."  Filing 39, Bates-stamped pp. 00386, 00521-23.

The plaintiff saw Dr. Ghalili for follow up on November 12, 2004.  The plaintiff reportedly had one episode of mid-sternal chest pain following the October 18, 2004 stent procedure.  This

13

pain was resolved with Nitroglycerin.  She denied having any
other episodes and was attending cardiac rehabilitation without
complications.  Filing 39, Bates-stamped p. 00525.

On November 17, 2004, the plaintiff sent a letter to NML
stating, "I am continuing to pursue this claim.  We are working
with an attorney.  We should be able to complete this matter
within a few months.  Please hold my file open."  Filing 39,
Bates-stamped p. 00128.  With the assistance of counsel, the
plaintiff filed an application for Social Security disability
benefits on December 3, 2004.[6]  Filing 39, Bates-stamped p.
00405.

NML's next contact regarding the plaintiff's claim occurred
on May 26, 2005, when it received notice from the Nebraska
Department of Insurance that the plaintiff had filed a claim
against NML.  Filing 39, Bates-stamped pp. 00140, 142.  During
the six-month gap between November 2004 and May 2005, the
plaintiff had seen Dr. Semin and reported experiencing some
angina while moving her parents to a nursing home, but otherwise
stated she was doing better.  Filing 39, Bates-stamped p. 00387.
She saw Dr. Ghalili in February 2005, at which time she was
"asymptomatic from a cardiac standpoint."  Filing 39,
Bates-stamped p. 00528.  Unfortunately, however, the plaintiff

---

[6]Applying Social Security law standards for determining if a
claimant is disabled, on September 5, 2005, the administrative
law judge found that the plaintiff was "closely approaching
advanced age," (20 C.F.R. § 404.1563), "[d]ue to occupational
demands in excess of her residual functional capacity, the
claimant is unable to perform the requirements of her past
relevant work," and "[b]ased on the claimant's inability to
perform work at any exertional level on a regular, sustained
basis in a competitive work environment, she is . . . 'disabled'
pursuant to Social Security Ruling 96-8p."  Filing 39,
Bates-stamped p. 00401.

14

had been diagnosed with breast cancer on the right side in
February 2005.  She underwent a mastectomy in March 2005 and
began receiving chemotherapy.  Filing 39, Bates-stamped pp.
00264-280, 388, 528.

    NML interpreted the plaintiff's Department of Insurance
claim filed in May 2005 as a request for additional review, and
asked a consulting physician to review the file.  This physician
noted that the plaintiff's combined medical conditions could
justify a disability finding, but he could not determine the
severity and timing of any disabling conditions or impairments
absent an opportunity to review her cardiology and oncology
treatment records.  On June 13, 2005, the plaintiff was asked to
submit this documentation by July 14, 2005.  Filing 39,
Bates-stamped pp. 00144, 610.

    In response, the plaintiff's husband forwarded a letter
authored by Dr. Semin which stated:

> Judy Finn has been a patient in our clinic for many
> years, and has had multiple significant health problems
> through that time. She has been disabled and unable to
> work since her coronary artery bypass graft done in
> 2003.  She has had significant severe heart disease,
> has had two heart bypasses, and then in October again
> had stents placed in the heart.  Due to her severe
> heart disease she is disabled and unable to perform the
> duties required to work.  She has also fought breast
> cancer, in 1997 had breast cancer and then
> unfortunately has had breast cancer again in 2005, in
> February diagnosed with an invasive breast cancer that
> had positive lymph nodes, is now going through
> chemotherapy. At this point the patient is quite weak
> considering her heart disease and this breast cancer
> and the current chemotherapy treatment.  The patient is
> fully disabled and requires the help of her husband to
> meet her daily needs at this point in time.  If there
> are questions or further forms needed filled out,
> please forward them to my office.

15

Filing 39, Bates-stamped p. 00156.  The accompanying letter from
the plaintiff's husband informed NML that additional specialist
statements were being accumulated and would be forwarded.
Finally, the husbands's letter explained that his wife worked 50
to 70 hours a week, not the 40 reported by PMS, and provided NML
with copies of job descriptions he believed were comparable to
his wife's job.  Filing 39, Bates-stamped pp. 00149-59.

The plaintiff did not provide copies of her medical records
before the July 14, 2005 deadline set forth in NML's June 13,
2005 letter.  The plaintiff's file was forwarded to NML's Quality
Assurance Unit for further review on July 28, 2005.  Filing 39,
Bates-stamped p. 00223.

By letter dated August 1, 2005, NML again asked the
plaintiff to provide copies of her medical records for treatment
provided by Drs. Ghalili, Potts, and Semin, stating receipt of
these records was important in determining her eligibility for
benefits, and perhaps for any vocational assessment of her
ability to return to work.  The letter also explained that any
disabilities caused by injuries or illnesses occurring after her
PMS employment ended, including her March 2003 rib fractures and
her 2005 breast cancer diagnosis and treatment, would not be
covered under the LTD policy.  Filing 39, Bates-stamped p. 00231.
The letter concluded:

> If you have medical documentation that supports you
> were disabled as a result of these conditions at the
> time you ceased work and during the 90-day period
> preceding your Beginning Date of benefits, January 30,
> 2003 through April 29, 2003, please bring this to our
> attention at your earliest convenience.  In the absence
> of any such information, it is unlikely any benefits
> would be payable for these particular conditions.

16

Filing 39, Bates-stamped p. 00230.  The letter requested an
extension of time for issuing a determination to permit retrieval
of the medical records.

    The plaintiff agreed to this extension and stated she would
submit the additional information as soon as possible.  Filing
39, Bates-stamped p. 00233.  NML suspended its review of the file
pending receipt of the additional medical records from the
plaintiff.  Filing 39, Bates-stamped p. 00233.  By August 29,
2005, NML had received the medical records of Drs. Semin and
Hutchins (plaintiff's oncologist).  Filing 39, Bates-stamped pp.
00264-92, 00394.  NML asked the plaintiff to sign a medical
authorization to retrieve Dr. Ghalili's records and directly
requested copies of these records.  Filing 39, Bates-stamped pp.
00399, 411, 617.  Dr. Ghalili's records were finally received by
NML on December 20, 2005.

    NML submitted the plaintiff's claim and accompanying records
for review by a board-certified internal medicine physician.
Filing 39, Bates-stamped p. 00540.  NML also sought and received
additional information from a vocational case manager.  The
vocational case manager investigated the plaintiff's actual job
at PMS by retrieving additional information from PMS and the
plaintiff's former co-workers, and analyzing the comparable
occupational job market.

    Based on the previously outlined and summarized comments in
the plaintiff's medical records, the consulting physician
concluded:

There is no documentation to support any ongoing
cardiac condition after her CABG[7] in January 2003 which
would preclude the claimant from a sedentary level
occupation after a reasonable time of recovery from
that surgery.  The documentation does not even indicate
that the claimant saw a physician on a regular basis
after that procedure, until she presents in September
2004 with complaints of some recurrence of angina.
However, the documentation of the recurrent angina is
not sufficient to support that the claimant would have
precluded from a sedentary level occupation.  It is
reasonable that she would have been out for a short
time during the time of her procedure for the
restenting and documentation indicates that she did
well after that procedure.

. . . There are no studies that support that "stress"
can produce coronary artery disease or any other
condition. . . . [I]t is my opinion that although it is
reasonable the claimant may have needed a different
work environment, her cardiac condition, nor any other
medical condition, were of a severity that would have
precluded her from a sedentary level occupation.  There
is no documentation that would indicate that the
typical stressors one would encounter on a day-to-day
basis, even in a work environment, would have
contributed to or worsened her condition.

The documentation does not support that the claimant's
cardiac condition or any other medical condition would
have precluded her from a sedentary level occupation
after March 2003 until February 2005 when she was
diagnosed with a new onset breast cancer.

Filing 39, Bates-stamped pp. 00545-46.  Upon further inquiry by
NML, the consulting physician supplemented the report to explain
that the plaintiff's work environment, even if considered
stressful, would not have exacerbated or significantly impacted
any of the her medical conditions.  Filing 39, Bates-stamped pp.
00589-94.

---

[7]CABG is an acronym for Coronary Artery Bypass Graft
surgery.

NML denied the plaintiff's disability claim on January 26, 2006.  Filing 39, Bates-stamped pp. 00589-94.  This letter thoroughly summarized the vocational and medical information in the plaintiff's claim file and set forth the following explanations and conclusions:

-- Since the plaintiff resigned from her position at PMS on January 31, 2003, she did not have disability coverage for her mastectomy in 2005, for treatment of her fractured ribs in March 2003, for her increased depression and anxiety reported in 2004, or for her hypothyroidism addressed in 2004.  Filing 39, Bates-stamped pp. 00590, 593.

-- The plaintiff's job was customized by PMS and, based on information from the employer, the plaintiff's co-employees, and the plaintiff, the job was best described as a Systems Analyst, which is a sedentary strength level occupation.  Filing 39, Bates-stamped p. 00592.

-- Although Social Security Disability benefits were approved, government and private disability programs may apply different rules.  Contrary to the plaintiff's position, NML cannot merely adopt the findings of the administrative law judge, but must evaluate the plaintiff's eligibility for LTD benefits under the terms of her Group Policy and the information available to NML.

-- Based on this information, the plaintiff's claim must be denied because:

19

[T]he medical documentation provided by your physicians does not support that your cardiac condition worsened, or was of such a severity as to prevent you from working in your Own Occupation beyond the normal recovery period for [coronary artery bypass surgery], which is eight weeks following surgery. . . . [I]n order for benefits to be paid, medical documentation from your physicians must support that you remained Disabled for the entire 90-day period prior to your Beginning Date of benefits, which is April 30, 2003. Following your coronary artery bypass in January 2003, your physician's medical records reflect that the procedure went well, and your angina-like symptoms were relieved. You did not report angina-like symptoms again until March 7, 2003, when it was reported that your symptoms improved with rest or nitroglycerin. Any symptoms you experienced in March 2003, were effectively treated with medication. You were not seen by your cardiologist until October 29, 2003. Therefore, your cardiac condition appeared to be stable following your coronary artery bypass and you should have been able to return to work eight weeks post surgery. Because you recovered prior to the end of the 90-day Beginning Date of benefits, you do not meet the Own Occupation Definition of Disability and the decision to deny your claim is correct and must be upheld.

Filing 39, Bates-stamped pp. 00590-91.

## LEGAL ANALYSIS

### A.   Standard of Review.

ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. See 29 U.S.C. § 1132(a)(1)(B). A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) should be reviewed under a de novo standard unless the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility for benefits or

20

to construe the terms of the plan.  Firestone Tire & Rubber Co.
v. Bruch, 489 U.S. 101, 115 (1989).  "Where the plan expressly
gives the administrator discretion to determine eligibility for
benefits and to construe the terms of the plan, an abuse of
discretion standard applies." Ratliff v. Jefferson Pilot
Financial Ins. Co., 489 F.3d 343, 346 (8th Cir. 2007)(holding the
abuse of discretion standard remains applicable when the plan
administrator's decision rests on a review of the claimant's
medical records).  "However, less deference is afforded if the
decisionmaker labored under a financial conflict of interest that
has 'a connection to the substantive decision reached,' or if a
procedural irregularity raises 'serious doubts as to whether the
result reached was the product of an arbitrary decision or the
plan administrator's whim.'" Weidner v. Federal Exp. Corp., 492
F.3d 925, 928 (8th Cir. 2007)

       The LTD policy at issue granted NML the "full and exclusive
authority to control and manage the Policy, to administer claims,
and to interpret the Policy and resolve all questions arising in
the administration."  Filing 39, Bates-stamped p. 00004.  This
authority extended to resolving "all matters when a review has
been requested," establishing and enforcing rules and
procedures to administer the policy and any claim for benefits,
determining if a claimant is eligible for benefits and the amount
of benefits allowed, and determining the "sufficiency and the
amount of information" reasonably required to support a claim.
"[A]ny decision the Company makes in the exercise of the
Company's authority is conclusive and binding."  Filing 39,
Bates-stamped p. 00004.

       Under the express language of the plan, NML was afforded
discretion to interpret the terms of the PMS LTD policy and

determine plaintiff's eligibility for benefits.  Therefore,
absent some showing of financial conflict of interest or
procedural irregularity, NML's determination is subject to review
under an abuse of discretion standard.


1.  <u>Procedural irregularity</u>.


When used in the context of evaluating a plan
administrator's review of an ERISA claim, a "procedural
irregularity" exists when in the exercise of his power, the
administrator acts dishonestly, or from an improper motive, or
fails to use judgment in reaching the decision.  Before any
heightened review is warranted based on a "procedural
irregularity, the plaintiff must show:  (1) that a serious
procedural irregularity existed, and (2) the procedural
irregularity caused a serious breach of the plan trustee's
fiduciary duty to the plan beneficiary.  <u>Pralutsky v.
Metropolitan Life Ins. Co</u>., 435 F.3d 833, 838 (8th Cir. 2006).


The plaintiff has failed to show any procedural irregularity
exists in this case.  NML not only reviewed and re-reviewed the
plaintiff's claim, each time granting the plaintiff's request to
submit additional medical and vocational evidence, it further
obtained the plaintiff's relevant medical records and sought an
outside review of all such records by a board-certified internal
medicine physician before reaching its final conclusion.  See
e.g.. <u>Woo v. Deluxe Corp</u>., 144 F.3d 1157, 1161 (8th Cir.
1998)(holding the Hartford failed to use proper judgment by
failing to have a scleroderma expert review the plaintiff's
disability claim); <u>Queen v. Hartford Life Ins. Co</u>., 188 F. Supp.
2d 1141 (D. Neb. 2002)(Bataillon, J., presiding)(denying
defendant's motion for summary judgment where the Hartford had

22

terminated the appeals process without responding to the claimant's request to submit to additional evidence).  Unlike the circumstances in Woo and Queen, there is no evidence that NML failed to use proper judgment or thoroughly investigate the plaintiff's claim, or that it thwarted the plaintiff's efforts to submit evidence in support of her claim.

Neither the alleged absence of objective evidence to support a denial of benefits, (see Pralutsky, 435 F.3d at 838), nor the alleged failure to consider and adopt a Social Security determination that the claimant is disabled, (Weidner, 492 F.3d at 929), warrant a finding of "procedural irregularity."  The plaintiff's substantive disagreement with NML's analysis of the administrative record is not a procedural irregularity.  Weidner, 492 F.3d at 928.

   2.   Conflict of Interest.

The plaintiff argues that NML has a financial conflict of interest because NML "decides if my claim is approved and pays the claim if my claim is approved."  Filing 25, p. 27.  "A plan beneficiary is not entitled to less deferential review absent material, probative evidence demonstrating that a palpable conflict of interest existed, which caused a serious breach of the administrator's fiduciary duty."  Farley v. Arkansas Blue Cross and Blue Shield, 147 F.3d 774, 776 (8th Cir. 1998).  There is no evidence of record explaining the financial relationship between PMS and NML, or the extent to which PMS may be self-insured for all or part of the plaintiff's claim.

"[I]t is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer."

23

<u>McGarrah v. Hartford Life Ins. Co</u>., 234 F.3d 1026, 1030 (8th Cir.
2000).  Even assuming the plaintiff had offered evidence that NML
would have financed any payment of benefits to the plaintiff,
thereby creating a situation that could be construed as a
conflict of interest, "a benefits determination includes equally
compelling long-term business concerns that would encourage
insurers to make these determinations in a fair and consistent
manner, thus negating any indicia of bias." <u>Farley</u>, 147 F.3d at
777.

     Moreover, even when the claimant successfully presents
material, probative evidence of a palpable conflict of interest
or serious procedural irregularity, he must also show the
conflict or irregularity caused a serious breach of the plan
administrator's fiduciary duty.  <u>Tillery v. Hoffman Enclosures,
Inc</u>., 280 F.3d 1192, 1197 (8th Cir. 2002).  Under this standard:

> The evidence offered by the claimant must give rise to
> serious doubts as to whether the result reached was the
> product of an arbitrary decision or the plan
> administrator's whim.  It is not enough simply to show
> the plan administrator did not act in the sole interest
> of the claimant.  The plan administrator's fiduciary
> duties extend to everyone covered by the plan, and an
> administrator who fails properly to investigate a claim
> breaches its fiduciary duty to all beneficiaries by
> granting benefits to unqualified claimants.

<u>Tillery</u>, 280 F.3d at 1197.  There is no evidence supporting an
argument that NML's substantive decision on the plaintiff's claim
rested on anything other than a thorough analysis of the evidence
in the plaintiff's claim file and the review of the plaintiff's
records by an outside and qualified physician.  The fact that the
plaintiff disagrees with NML's findings is not sufficient to
raise an evidentiary inference of NML's alleged breach of
fiduciary duty.

24

The plaintiff has failed to show any procedural irregularity in NML's handling of the plaintiff's claim, that NML had a financial conflict of interest, or that any procedural irregularity or conflict of interest caused a serious breach of NML's fiduciary duty.  Therefore, the court must review NML's denial of the plaintiff's claim under an abuse of discretion standard.  <u>McGarrah</u>, 234 F.3d at 1030(holding abuse of discretion standard applied despite the dual role of plan administrator and plan-funding insurer where there was no evidence of the financial relationship between the administrator and employer, or that the alleged conflict was connected to the administrator's benefits decision).

**B.   <u>Review of the Administrative Record</u>.**

Under the abuse of discretion standard:

> The administrator's decision to deny benefits will stand if a reasonable person could have reached a similar decision. . . .  A reasonable decision is one supported by substantial evidence, which is more than a scintilla but less than a preponderance. . . . Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

<u>Ratliff</u>, 453 F.3d at 1090(internal citations and quotation marks omitted).  The plan administrator's decision need not be the only sensible interpretation of the plaintiff's claim, provided its decision "offers a reasoned explanation, based on the evidence, for a particular outcome.  If the plan administrator's decision offers a reasonable explanation, the decision should not be disturbed even if another reasonable, but different, interpretation may be made." <u>Tillery</u>, 280 F.3d at 1199.

25

The administrative record before the court reveals not only sufficient but abundant evidence supporting NML's decision to deny the plaintiff's disability claim.  None of the plaintiff's medical records generated before or during the 90 days following the plaintiff's January 31, 2003 bypass surgery stated the plaintiff would be unable to return to her occupation on the 91st day following surgery.  Since the plaintiff did not seek ongoing care during this time frame, NML could reasonably infer that she did not experience significant post-surgical problems that would substantially delay in her anticipated eight-week recovery.  Upon comparing the physical restrictions placed on the plaintiff by Dr. Potts in March of 2003 with PMS' description of the plaintiff's job requirements, it appears the plaintiff would have been able to return to her job at PMS within 90 days of surgery had she not resigned before undergoing surgery.

The plaintiff's medical problems arising after January 31, 2003 cannot provide a basis for awarding the plaintiff disability benefits.  When those problems and related impairments arose, the plaintiff was not "insured under the Policy."  Filing 39, Bates-stamped p. 00015.  However, to the extent that the plaintiff's subsequent medical history is relevant, a reasonable person could conclude this history supports rather than undermines NML's determination.  For at least 18 months following her bypass surgery, the plaintiff did not regularly seek medical care for cardiac problems, did not attend follow up appointments at the recommended intervals, and did not report any ongoing and significant cardiac problems during the follow up appointments she did attend.  Significant problems were not reported until September 2004, and even then, further surgery was performed and a week thereafter, her jaw pain was gone, her energy level was

returning, and she was feeling "pretty well."  Filing 39,
Bates-stamped pp. 00386, 00521-23.

The plaintiff was not seen by her cardiologist, Dr. Ghalili,
until six months after her surgery.  By the time she saw the
cardiologist, her first claim for benefits had already been
denied by NML and she reportedly had a rapid pulse at the
appointment due to the stress of trying to secure disability
benefits.  The plaintiff's cardiologist wrote a letter on
plaintiff's behalf which stated the plaintiff's PMS job was
apparently stressful, and she should stay away from stressful
situations.  However, there is nothing of record indicating Dr.
Ghalili was aware of the material duties of the plaintiff's
occupation, placed any specific restrictions on the plaintiff
(other than to avoid stress), or had any objective basis for
stating she could not perform the material duties of her
occupation for either PMS or another employer beginning 90 days
after her bypass surgery.  The doctor's letter acknowledged that,
"She can work at other types of jobs."  Filing 39, Bates-stamped
p. 00121.

A June 2005 letter from Dr. Semin, the plaintiff's internal
medicine doctor, stated, "Judy Finn has been a patient in our
clinic for many years, and has had multiple significant health
problems through that time.  She has been disabled and unable to
work since her coronary artery bypass graft done in 2003."
Filing 39, Bates-stamped p. 00156.  However, Dr. Semin was not
the plaintiff's doctor prior to, during, or for the nineteen
months following the plaintiff's January 31, 2003 bypass surgery,
never stated he knew what the plaintiff's job duties were, and
never placed any specific restrictions and limitations on the
plaintiff's ability to perform any occupational duties.  "It is

27

not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." <u>McGee v. Reliance Standard Life Ins. Co</u>., 360 F.3d 921, 925 (8th Cir. 2004)(holding it was not unreasonable for the plan administrator to accept the opinion of its outside expert hired to review the plaintiff's file and reject the opinion of a treating physician that was not supported by objective testing or reasoning).  Moreover, assuming Dr. Semin could be considered a treating physician with respect to the time frame at issue in this case, his opinion may be entitled to deference when determining whether the plaintiff should receive social security disability benefits, but this "treating physician" deference is not applicable to ERISA cases.  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822 (2003).

NML hired a qualified physician to review the plaintiff's medical records and file and provide an opinion as to whether the plaintiff was disabled following her January 31, 2003 surgery. In a detailed opinion letter addressing the panoply of plaintiff's medical records, this medical expert concluded the plaintiff was not disabled as of 90 days after her January 31, 2003 bypass surgery, and that the alleged stress of plaintiff's occupation did not cause and would not exacerbate her cardiac problems.  This opinion supported NML's own initial assessment of the plaintiff's medical and disability claims.

The court finds that NML's denial of plaintiff's claim was based on a sensible interpretation of the evidence presented, as reasonably explained in its denial letter.  NML did not abuse its discretion in denying the plaintiff's claim for LTD benefits under the PMS group policy.  The defendant's motion for summary judgment must be granted.

28

IT THEREFORE HEREBY IS ORDERED:

1.    The defendant's motion for summary judgment, filing 30,
      is granted.

2.    Judgment will be entered in accordance with this
      Memorandum and Order.

DATED this 11th day of December, 2007.

                    BY THE COURT:

                    s/ *David L. Piester*
                    David L. Piester
                    United States Magistrate Judge

29